*In re* TUNG YEONG.

(*District Court, D. California.*   February 1, 1884.)

1. CHINESE IMMIGRATION—CUSTOM-HOUSE CERTIFICATES.
    By the treaty of 1880, Chinese laborers then in the United States were accorded the privilege of coming and going at pleasure.   The restriction act of 1882 extends this liberty to all who arrive before the expiration of 90 days after the passage of the act.   This law also requires incoming Chinamen to produce custom-house certificates.   The language of the act is ambiguous and might be so construed as to require the certificate from those who left the country between the adoption of the treaty and the passage of the restriction act, but as no provisions existed during that period for the issue of such certificates, this construction would be clearly repugnant to the treaty.   The court, therefore, holds that Chinese laborers who were in the United States at the date of the treaty, and who departed before the act took effect, are entitled to land without producing custom-house certificates.

2. SAME—MERCHANTS.
    Only Chinese laborers are excluded.   Those who come to engage, in good faith, in mercantile occupations are *held* to be entitled to land, and their Canton certificates are *prima facie* evidence of their mercantile character.

3. SAME—CHILDREN.
    Nothing in the law is held to prevent parents living here from sending for their children who are two young to be classed as laborers.

On *Habeas Corpus*.

*S. G. Hilborn,* U. S. Atty. for California, and *Carroll Cook,* Asst.
U. S. Atty. for California, for the United States.

*Lyman J. Mowry,* for the detained.

*Milton Andros,* for Williams, Dimond & Co., agents Pacific Mail
S. S. Co., who held petitioners.

HOFFMAN, J. The very great number of cases in which writs of
*habeas corpus* have been sued out of this court by Chinese persons
claiming to be illegally restrained of their liberty, and which were of
necessity summarily investigated and disposed of, has rendered it
impossible for the court to deliver a written opinion in each case.
The evidence in the various cases and the rulings of the court have
been very imperfectly reported by the press, and the latter, though
much criticised, have not, it is believed, been thoroughly understood.
It is deemed proper to set forth in an opinion, as succinctly as may
be, the general nature of these cases, of the evidence upon which the
decision of the court has been based, and its rulings upon the more
important of the questions which have been presented for its deter-
mination.

The applications for discharge from a restraint claimed to be ille-
gal may be divided into three classes:

*First.* Applications on the ground of previous residence. By the
second article of the treaty it is provided that "Chinese laborers now
in the United States shall be allowed to go and come of their own
free will and accord, and shall be accorded all the rights, privileges,
immunities, and exemptions which are accorded to the citizens and
subjects of the most favored nations." 22 St. 827. By the third
section of the law, known as the restriction act, the same privilege is
indirectly extended to laborers "who shall have come into the United
States before the expiration of ninety days next after the passage of
this act." The date of this treaty is November 17, 1880. The date
of the passage of the law is May 6, 1882. During this interval large
numbers of Chinese laborers, who were protected by the treaty, have
left the country, of course, unprovided with custom-house certificates,
for there was no law then existing which required them to obtain
them or authorized the custom-house authorities to furnish them.

The language of the law is ambiguous, and perhaps admits the
construction that the laborers who left this country during the inter-
val I have mentioned should be required to produce the custom-
house certificate provided for in the act. It was not doubted by the
court that if the treaty and the law were irreconcilably conflicting,
the duty of the court was to obey the requirements of the law, but it
was considered that no construction should be given to the law which
would violate the provisions of the treaty, if such construction could
be avoided. It was therefore held that a Chinese laborer who was
here at the date of the treaty, and who left the country before the
law went into operation, might be admitted without producing a cus-

tom-house certificate, which it would be impossible for him to obtain, and that it was inadmissible, if not indecent, to impute to congress, when legislating to carry into effect our treaty with China, the intention to deprive laborers of the right to come and go of their own free will and accord, which was explicitly recognized and secured by the treaty, by exacting as a condition of its exercise the production of a certificate which it was out of their own power to obtain. *In re Chin A On*, 18 FED. REP. 506. It was also held that Chinese who were not in the country at the date of the treaty were not embraced within the provisions of the second article, and also that a Chinese laborer who, although in the country at the date of the treaty, had left after the law went into practical operation, and who neglected to procure a certificate, was not entitled to return. As to the soundness of the last ruling, doubts may be entertained. It is understood that the question will shortly be submitted to the circuit court.

If there be error in these rulings it is assuredly not in favor of the Chinese. The right of laborers who can prove they were in the country at the date of the treaty, and had left before the law went into effect, to be allowed to land without the production of a custom-house certificate, being thus recognized, the court held that the burden of proof was on them, and that satisfactory evidence of the facts would be rigorously exacted. In some cases this evidence was such as to establish the facts beyond all reasonable doubt; as, for instance, the former residence and departure of the petitioner was in one case proved by the testimony of the reverend gentlemen at the head of the Chinese mission in this city, who swore not only to his personal recollection of the fact, but produced a record of the proceedings of the sessions of his church, in which the departure of the petitioner and his resignation of the office of deacon, which he held, and the appointment of his successor, are recorded. These records, he testified, were in his own handwriting, and were made at the date which they bore. In another case a young lady connected with the mission proved the departure of the petitioner, (who was a convert and her pupil,) not merely by her own testimony as to the fact, but by the production of a religious book which she gave him at the time of his departure, on the fly-leaf of which were inscribed, in her own handwriting, and signed by herself, some expressions of regard, together with some texts of scripture. This book, she testified, was handed to him on board the vessel at the date of the inscription on the fly-leaf, with the injunction to keep it and bring it back on his return. It was accordingly brought back and produced in court. On proofs such as these no rational doubt could be entertained, and the petitioners were discharged.

But in the large majority of cases proofs hardly less satisfactory were exacted and furnished. The Chinese, on returning to their country, almost invariably procure permits from the companies of which they are members, and which are furnished them on payment

of their dues. The departure of the members and the payment of their dues are recorded in the books of the company. These books the court invariably required to be produced. It also appears that, in most cases, their savings, accumulated in this country, are remitted to China for their account by mercantile firms in this city, and also that their tickets are, in many cases, purchased through the agency of those firms. The production of the firm books showing these transactions was, in like manner, required, and they, together with the books of the companies, were subjected to the critical scrutiny of Mr. Vrooman, the very intelligent, competent, and entirely reliable Chinese interpreter.

In very many cases all these books were produced in court, and, in some instances, the evidence they afforded was corroborated by testimony of white persons in whose employ the petitioner had been, and who testified to the time of his departure. It is, of course, possible that, in some instances, the court has been deceived, but considering that in no case has a person been allowed to land on the plea of previous residence on unsupported Chinese oral testimony, the number of such instances cannot be large. The proofs were in all cases sufficient to satisfy any candid and unbiased mind. Of the whole number thus far discharged by the order of the court, it is believed that those discharged on the grounds stated constitute nearly one-half. In justice to the six companies I should add that their presidents have spontaneously offered to the court to cause copies of their books, with records of departures of their members during the interval I have mentioned, to be made at their own charges, such copies to be verified by Mr. Vrooman, by comparison with the original records, and then to be deposited with the court. When this is done no means will any longer exist of interpolating or adding new names on the books of the companies. It will still remain possible for a Chinese laborer to assume the name, and personate the character of some one whose name appears on the records; but this mode of deception it seems impossible wholly to prevent.

*Secondly.* Applications founded on the productions of Canton certificates. The investigation of this class of cases proved exceedingly embarrassing to the court, and is attended with difficulties almost insuperable. The certificates furnished at Canton by the agent of the Chinese government, the law declares, shall be *prima facie* evidence of a right to land. This provision of the law, whatever distrust might be felt as the reliability of these certificates, the court could not disregard. The counsel for the petitioner usually presented a Canton certificate to the court and rested his case. The district attorney was necessarily without the means of disproving the truth of the certificate except by such admissions as he might extract from the petitioner himself when placed on the stand, or had been gathered from him upon his examination by the custom-house officials.

The district attorney was therefore allowed to call the petitioner, and cross-examine him in a most searching manner, and contradict, if he could, his statements; in short, to treat him as an adverse witness called by the opposite side. This method, though somewhat irregular, seemed to be the only one to be adopted with any hope of arriving at the truth. Another embarrassment under which the court labored was the inability to attach any distinct and definite signification to the term "merchant;" but, inasmuch as the treaty expressly declares that the only class to be excluded are "laborers," and that no other class is within the prohibition of the treaty, it was held by the court that the inquiry was not so much whether the person was a merchant as whether he was a "laborer," and that that inquiry should relate, not to his occupation or *status* in China, but to the occupation in which he was to be engaged in in this country; as the intention and object of the law was to protect our own laborers from the competition and rivalry of Chinese laborers here.

At first sight it would seem that the production of the books of a respectable mercantile firm, in which the name of the petitioner was inscribed as a partner, would be sufficient to establish his *status* as a merchant. It was soon found, however, that this mode of proof was, to a great extent, unreliable; for, *first*, the books might be falsified, and the entry made to meet the exigencies of the case; and, *secondly*, it appeared that the Chinese are in the habit of placing their earnings in stores or mercantile establishments, and in virtue of this investment they are admitted to a share of the profits. It might, therefore, often happen that a Chinese laborer would appear on the books of the company as holding an interest to the amount of a few hundred dollars in the concern, while he himself remained a laborer, and could in no sense of the term be called a merchant or a trader. The books above spoken of were in all cases subjected to a rigid scrutiny, with a view of detecting interpolations and falsifications. I am satisfied that in spite of the efforts of the court, which in almost all cases itself subjected the petitioner to a rigid cross-examination, and, in spite of the efforts of the district attorney, some persons have been admitted on Canton certificates who have no right to land, in what numbers it is impossible to say, but this result seemed to be the necessary consequence of the fact that the law made the certificate *prima facie* evidence of the petitioner's right, and of the difficulty of ascertaining the facts. A considerable number of cases were also presented to the court, where the petitioner claimed to be about to enter some mercantile establishment in which his brother or his uncle or his father was interested. The existence of the establishment was usually proved beyond a doubt, but the court was at the mercy of oral testimony as to the intended adoption of the petitioner as a partner. In some instances letters were produced from his relatives in this city, addressed to him in Hong Kong, inviting him to come to

this country to be admitted to the business, but the genuineness of these letters was often doubtful, and no obstacle existed to their manufacture in this city after the arrival of the steamer.

In several cases it appeared by the petitioner's own admission that he was a laborer in China; that he came to this country wholly unprovided with money; and that he expected to enter the store of his brother, or uncle, or other relative, as a porter. In such cases he was remanded to the ship; but even in those cases where the petitioner, or his uncle, or other relatives declared that he was to be admitted to the business, the court became aware that it might be the victim of gross imposition if, on such testimony, any Chinese person engaged in mercantile pursuits here could import as many laborers as he might declare to be brothers, sons, or nephews, and testify that he proposed to admit them to the business. In some instances pretentions of this kind have been summarily rejected. In other instances the court has felt compelled to discharge the petitioner on a preponderance of proof, though not without serious misgivings as to the facts of the case.

*Third.* Children brought to or sent for by their parents or guardians in this city. In almost all these cases the petitions were filed on behalf of children of from 10 to 15 years of age. Their fathers or other relatives testified that they had sent for them to be brought to the United States with a view of placing them at school to learn the English language, and later to adopt them into their business. The parents who thus claimed to exercise the natural right to the custody and care of their children were, in almost every instance, Chinese merchants; sometimes of considerable substance, resident here, and entitled, under the provisions of the treaty, to all the rights, privileges, and immunities of subjects and citizens of the most favored nation. Absurdly enough, these children, in many instances, were provided with Canton certificates, but, though they were in no sense merchants, many of them being much too young to earn their living, they were certainly not laborers; and it was not without satisfaction that I found there was no requirement of the law which would oblige me to deny to a parent the custody of his child, and to send the latter back across the ocean to the country from which he came.

The foregoing presents a general, but I think sufficient, statement of the various questions which have arisen in these cases, and of the rulings of the court upon them. If there be error in those rulings I am unable to discern it. It will be cheerfully corrected when found to exist by the judgment of a higher court, or even when pointed out by any one who shall first have taken the pains to ascertain what rulings of this court have actually been, a natural, and one would think necessary, preliminary which has hitherto been largely dispensed with by the more vehement of those by whom the action of the court has been assailed. That some persons have been suffered to land under Canton certificates who were in fact within the pro-

hibited class there is great reason to fear. How this could have been prevented by the action of any court, honestly and fearlessly discharging its duty under the law and the evidence, has not been pointed out.

By the constitution and laws of the United States, Chinese persons, in common with all others, have the right "to the equal protection of the laws," and this includes the right "to give evidence" in courts. A Chinese person is therefore a competent witness. To reject his testimony when consistent with itself, and wholly uncontradicted by other proofs, on the sole ground that he is a Chinese person, would be an evasion, or rather violation, of the constitution and law which every one who sets a just value upon the uprightness and independence of the judiciary, would deeply deplore. But while according to Chinese witnesses the right to testify secured to them by the constitution and the law, no means of arriving at the truth within the power of the court have been neglected, and the ingenuity of the district attorney and the court has been taxed in the attempt to elicit the truth by minute, rigorous, and protracted cross-examinations. That it has frequently been baffled was naturally to be expected. But notwithstanding these unavoidable evasions, the practical operations of the act has been by no means unsatisfactory.

Returns obtained from the custom-house show that from the fourth of August, 1882, to the fifteenth of January, 1884, a period of nearly 16 months, there have arrived in this port 3,415 Chinese persons. During the same period there have departed no less than 17,088. It thus appears that not only has the flood of Chinese immigration, with which we were menaced, been stayed, but a process of depletion has been going on which could not be considerably increased without serious disturbance to the established industries of the state. It is stated that the wages of Chinese laborers have advanced from $1 to $1.75 *per diem*,—a fact of much significance, if true. It is much to be regretted that the notion that the law has, through its own defects, or the fault of the courts, proved practically inoperative, has been so widely and persistently disseminated. Such a misapprehension cannot have failed to be injurious to the state by preventing the immigration of white persons from the east to replace the Chinese who are departing.

Another circumstance which, though not contemplated by the law, has incidentally attended its enforcement, may be mentioned. The costs, the attorneys' fees, and the inconvenience and expense of attending upon the courts until their cases can be heard, must, in effect, have imposed upon the Chinese arriving here charges nearly or quite equal to the capitation tax, which in Australia has been found, it is said, sufficient to secure their practical exclusion. On this point I have no accurate information. But the liability to the charges I have mentioned cannot fail to exercise a strong deterring influence upon the lower classes of Chinese laborers.

In the case at bar the proofs establish beyond a rational doubt

that the petitioner was in the United States at the date of the treaty, and that he left the United States before the passage of the law which enabled or required Chinese laborers to procure custom-house certificates. He is therefore, in my judgment, entitled to be discharged.